# McCarthy *v.* Philadelphia and Reading Railway Company.

*Evidence—Charge—Assignments of error.*

Where evidence has been properly admitted and its admission is assigned as error, the appellate court cannot consider or correct an error alleged in a portion of the charge relating to such evidence, where that portion of the charge has not been assigned as error. The appellate court can correct only such errors as are assigned.

*Negligence—Evidence—Damages.*

In an action to recover damages for personal injuries, the plaintiff, a bartender, may testify as to what his occupation had been, as to how much he had made per week, and that by reason of the accident he could no longer follow his occupation.

*Negligence—Railroads—Crossings—Signal by gateman—Evidence—Contributory negligence.*

In an action against a railroad company to recover damages for personal injuries, it appeared that the plaintiff at the time of the accident was standing on the rear step of an ice wagon. The wagon when near a railroad crossing was stopped by a trolley car in front of it, which had been stopped by the lowering of the gates. Another man was standing on the step of the wagon beside plaintiff, to the right, with his left arm around plaintiff's body, holding on to a strap with his left hand. The flagman was on the track, and after a north-bound train had passed, and the gates been raised, he signaled to the motorman of the traction car to come on. The car moved toward and across the tracks, followed by the ice wagon. When the wagon approached the gates the driver either stopped or was about to stop. Plaintiff testified that he himself looked and listened, although his view to the south was obstructed by standing cars. Apprehensive that there might be danger, he called to the driver, "you had better stop and take another look." The driver then asked the gateman, "How is it?" and the reply of the gateman, as he beckoned them on, was "All right, come on." The wagon then proceeded and was struck by a train from the south, and the plaintiff was injured. The man who was standing on the step beside the plaintiff, having a better view, saw the approaching train, and jumped and escaped. *Held*, that the question of plaintiff's contributory negligence was for the jury, and that a verdict and judgment for plaintiff should be sustained.

Argued Jan. 6, 1905. Appeal, No. 103, Jan. T., 1904, by defendant, from judgment of C. P. No. 4, Phila. Co., March T., 1902, No. 1213, on verdict for plaintiff in case of Cornelius McCarthy v. Philadelphia and Reading Railway Company. Before DEAN, FELL, BROWN, MESTREZAT, POTTER and ELKIN, JJ. Affirmed.

Trespass to recover damages for personal injuries. Before CARR, J.

At the trial it appeared that plaintiff, whose occupation was that of a bartender, was riding at the time of the accident on the back step of an ice wagon. As the wagon crossed one of defendant's tracks it was struck by a train and plaintiff was injured. The circumstances of the accident are detailed in the opinion of the Supreme Court.

When the plaintiff was on the stand he was asked this ques-

tion : " Q. Where were you going from Eleventh and Berks ? A. To Eighth and Montgomery avenue.   Q. What were you going there for ? "

Mr. Hart : That is objected to.

Objection overruled.   Exception noted for defendant.  [1]

" Q. What were you going there for ?   A. I was going there to get a job tending bar, with the intention of buying the place."

\*       \*       \*       \*       \*       \*       \*       \*

" Q. Where did you stop ?   A. Back of the trolley car.   As the train passed up we stood there for a minute or two minutes, probably three minutes, and when the train passed up the railroad watchman lifted the gates for the car to pass, the trolley watchman blew his whistle, and the car came on.   The car went ahead, and we went after the car.   When we got to the gates, I could not see up or down the track, because there were coal cars on both sides, and I put my head in the wagon, and I told Derr " ——

Mr. Hart : I object to any conversation between the witness and anybody that is not sought to be charged with negligence as immaterial.

The Court : " Q. Who were you going to have the conversation with ?   A. The driver of the wagon."

Mr. Scarborough : I offer to show that this witness, as the team was being driven through the gates, stuck his head in the wagon and called to the driver, Derr, " You had better stop and look again," this being but about a half minute or half a second before the accident happened, and while the ice wagon was in the very act of crossing the railroad.

Objected to.   Objection overruled.   Exception noted for defendant.  [2]

The Court : " Q. What did you say to the driver ?   Could you see him ?   A. I could not see him.   Q. How was the hood you were standing under, down or up ?   A. Down.   I hallooed into the wagon to Derr, ' You had better stop and take another look.' "

\*       \*       \*       \*       \*       \*       \*       \*

" Q. Who raised the gates ?   A. The railroad watchman, Mr. Eagan.   Q. What did he do while you were crossing over ? A. When we got to the gates Derr said to him, ' John, how is it ? ' "

Mr. Hart: I object to this.

Mr. Scarborough: I offer to show by this witness that as the horses came between the raised gates the driver of the ice wagon, Mr. Derr, went to the railroad's gate tender and said, "Jack, how is it?" and that the railroad's gate tender called back and said, "All right; go ahead."

Mr. Hart: That is objected to.

Objection overruled. Exception noted for defendant. [3]

The Court: "Q. Could you see Eagan from where you were? A. Yes; I was looking out at the side of the wagon, and I saw Eagan."

Mr. Scarborough: "Q. Where was Eagan? A. Standing at the gate. Q. Which one was it; what corner? A. The northwest corner."

Mr. Hart: I object to this conversation.

The Court: I understand the witness is able to say the conversation with Eagan. There is no proof as to who was driving this wagon, and this man could not see who was driving because he could not see through the board at the back of the seat.

Mr. Scarborough: I desire to amend my offer and supplement it by showing that as the gatekeeper spoke these words, he beckoned to the occupants of the wagon to drive ahead by beckoning this way with his hands. (Indicating.)

Mr. Hart: That is objected to.

The Court: Do you mean he beckoned to the men on the back part of the wagon?

Mr. Scarborough: He beckoned to the men on the driver's seat of the wagon, and including the driver and the helper.

Mr. Hart: I object.

"Q. How was this wagon being taken across there? A. Mr. Derr and Mr. Hones were on the seat of the wagon; they were driving."

The Court: "Q. Who was driving? A. I cannot say who was driving the wagon. Q. You do not know whether Derr or the other man? A. No."

Mr. Scarborough: "Do you know who occupied the position known as driver of the wagon? A. No; I could not say."

Mr. Hart: I object.

"Q. How long did this conversation between Mr. Derr and

Mr. Eagan take place before the collision? A. I guess about half a minute. Q. How fast were the horses traveling while crossing the railroad? A. They were going at a smart walk, just prior to getting into a trot, after starting to get over the tracks."

Mr. Scarborough: I propose to follow up this offer by showing that Derr was actually holding the lines and driving the horses at the time he called to this gentleman, Eagan, to inquire, and when Eagan beckoned him on.

The Court: The offer is admitted with that understanding.

Exception noted for the defendant.

" Q. Go ahead and give that conversation; state what was said by Derr, or by Eagan, while the wagon was being driven through. A. When the wagon got to the gate, Derr says to Eagan, ' Jack, how is it? ' and he says, ' All right; come on,' and he beckoned with his hand. I was looking out on the north side of the wagon at that time, and I took my head back as we got up to the gates and looked north and south, and could not see anything with the house at the north side with the coal cars at the south side—the watchman's house on the north side. Q. What had you earned as a bartender for your brother between November, 1891, and November, 1895 ? "

Mr. Hart: That is objected to.

The Court: Your object is to show that he had skill as a bartender, and by reason of the accident, he could not follow it any longer?

Mr. Scarborough: Yes.

The Court: The objection is overruled.

Exception noted for defendant. [4]

" A. I had $15.00 a week and my board and lodging and my keep and my chances besides, which amounted to about $25.00 a week. Q. What do you mean by your chances ? A. Customers that we deal with, and in order to stand in with the bartender, they always tip them off. Q. What we ordinarily know in life as ' tips '? A. Yes."

*       *       *       *       *       *       *

John J. Eagan, the gateman, was asked this question :

" Q. Who was driving? A. His helper was driving. Q. What is his name? A. Hones, I believe. He came out and

threw up his hand.   When I went out he threw up his hand and he says to me, ' Hello, Jack —' "

Mr. Hart : I object.

" Q.  Which side of the wagon was he seated on?  A.  He was seated on the left side of the wagon.  Q.  By you?  A.  Yes."

Mr. Hart: I object to any conversation which took place between the witness and some person other than the plaintiff.

Objection overruled.  Exception noted for defendant. [5]

" Q.  He was seated on the front seat?  A.  Yes.  Q.  He was right by Hones?  A.  Yes.  Q.  Hones had the reins, as I understand it?  A.  Yes ; Hones was driving, as near as I recollect.  Q.  How far from you was Derr?  A.  He was almost opposite to me.  He was on the wagon, up above me.  I was on the side, walking on out.  Q.  You were going in the same direction he was going?  A.  Yes.  Q.  How many feet from you was he ?  A.  Right about opposite to me.  Q.  How many feet—six, eight or ten ?  A.  No ; he was right alongside of me.  Q.  Was he three feet from you?  A.  About three feet.  He says, ' Hello, Jack ; how is it ? ' I says, ' All right ; go ahead, Derr.'  I was walking out.  Just as he reached the north-bound track—the horses cleared it—"

The court refused binding instructions for defendant.

Verdict and judgment for plaintiff for $10,000.  Defendant appealed.

*Errors assigned* were (1–5) rulings on evidence, quoting the bill of exceptions ; (6) refusal of binding instructions for defendant.

*Gavin W. Hart,* for appellant, cited : Lake Shore, etc., Ry. Co. v. Frantz, 127 Pa.  297 ; Roberts v. Canal Co., 177 Pa. 183 ; Borough of Carlisle v. Brisbane, 113 Pa. 544 ; Township of Crescent v. Anderson, 114 Pa. 643 ; Dean v. Penna. R. R. Co., 129 Pa.  514.

*Henry W. Scarborough,* for appellee, cited : Phila. & Reading R. R. Co. v. Killips, 88 Pa. 405 ; Matthews v. R. R. Co., 161 Pa. 28 ; Roberts v. Canal Co., 177 Pa. 183 ; Jones v. Harris, 186 Pa. 469 ; Fennell v. Harris, 184 Pa. 578 ; Sutliff **v.**

Penna. R. R. Co., 206 Pa. 267 ; Ely v. R. R. Co., 158 Pa. 233 ; McNeal v. Ry. Co., 131 Pa. 184; Whitman v. Penna. R. R. Co., 156 Pa. 175 ; Arnold v. R. R. Co., 161 Pa. 1 ; Philpot v. Penna. R. R. Co., 175 Pa. 570 ; Smith v. R. R. Co., 158 Pa. 82 ; Davidson v. Ry. Co., 171 Pa. 522 ; Link v. R. R. Co., 165 Pa. 75 ; Haverstick v. R. R. Co., 171 Pa. 101 ; Neiman v. Canal Co., 149 Pa. 92 ; Glushing v. Sharp, 96 N. Y. 676 ; Eddy v. Powell, 49 Fed. Repr. 814 ; Worthington v. P. & R. Ry. Co., 23 Pa. Superior Ct. 195 ; Wolfe v. Penna. R. R. Co., 22 Pa. Superior Ct. 335.

OPINION BY MR. JUSTICE BROWN, March 20, 1905 :

Five of the six assignments of error in this case relate to the admission of testimony. The first complaint of the appellant is that the court ought not to have permitted the plaintiff to testify that when he was injured he was on his way to Eighth street and Montgomery avenue, " to get a job tending bar, with the intention of buying the place." This was in reply to the question, " What were you going there for? " The purpose of this question was not asked, and the answer was admitted under a general objection. From all that appears from the record, no error was committed in admitting the testimony at the time it was received ; but it is now argued on this appeal that it was improperly admitted, because, in the general charge to the jury, the court instructed them that, in estimating the plaintiff's loss of earning power, they could take into consideration his testimony that he was on his way to a saloon, with the intention of trying to get employment as a barkeeper and of ultimately becoming the proprietor by buying it. The only error, if any, in connection with this testimony is in that part of the charge of the court relating to the same, but neither that portion of it nor any other part of it has been assigned as error. The first assignment must, therefore, be dismissed, for we can correct only such errors as are assigned.

The purpose of the testimony which is the subject of the fourth assignment was to show the loss of the plaintiff's earning power as a bartender, which had been his occupation and which he could no longer follow by reason of his injuries. His testimony on this point was clearly proper, and the assignment

relating to it is without merit.   There is nothing in the testimony of the plaintiff, the admission of which is assigned as error in the second and third assignments, nor in that of Eagan, the gateman, the subject of the fifth assignment, which ought to have been excluded.   The plaintiff was standing on the rear step of the wagon and the gateman was at the crossing. Each testified to just what had occurred and what the situation was at the time the driver of the ice wagon started to cross over the tracks and got upon them, and the testimony of each, which was objected to, had a very proper place in the proofs.

The remaining assignment is that the court erred in refusing the request of the defendant to direct a verdict in its favor. Its negligence was conceded on the trial, and the ground of the refused request was the alleged contributory negligence of the plaintiff.   The defendant submitted no evidence, and the learned judge, in the light of that offered by the plaintiff, refused to take from the jury the question of his contributory negligence and to judicially declare that it was a bar to his right to recover.

The ice wagon, when near the railroad crossing, was stopped by a trolley car in front of it, which had been stopped by the lowering of the gates.   The plaintiff was standing on the step at the rear of the wagon.   A man named Moore was standing on it beside him, to the right, with his left arm around plaintiff's body, holding on to a strap with his left hand.   The trolley flagman was on the tracks, and, after a north-bound train had passed and the gates been raised, he signaled to the motorman of the traction car to come on.   It moved towards and crossed the tracks, followed by the ice wagon.   According to one witness, when the horses' heads were at the gates the driver stopped, and, according to another, he was about to stop.   Be this as it may, the plaintiff says he was looking and listening, though his view to the south was obstructed by cars standing on the siding.   Apprehensive that there might be danger, he called to the driver, "you had better stop and take another look."   The driver then asked the gateman, "How is it, John?" and the reply of the gateman, as he beckoned them on, was, "All right, come on."   The plaintiff and the witness Hones, seated in the front of the wagon, not only heard Eagan, but saw him when he signaled the driver of the wagon to

come on.   Moore, who saw the approaching train when it was within a few feet of him, jumped from the wagon step and escaped.   Under the foregoing state of facts, the court could not have pronounced the plaintiff guilty of contributory negligence, for it was the exclusive province of the jury to say whether he had or had not, under the circumstances, done all that was required of a prudent man.   Approaching a grade railroad crossing, with his own view to the south cut off, up to the very point of crossing, he was on the lookout for danger, apprehensive that he might be in its path, and, but for the conduct of the gateman, it might be that he ought to have exercised a higher degree of care; but, whether he did exercise the proper degree was, under the circumstances detailed, for the jury. On the alert, looking as best he could for danger in the direction from which it came, he heard from the defendant's employee, whose duty it was to guard against peril at the crossing, the assurance that the way was clear, and he saw the beckon to come over as the gateman said " All right; come on." Of our many cases which sustain the court in its refusal to direct a verdict for the defendant, on the ground of the plaintiff's contributory negligence, reference need be made only to Fennell v. Harris et al., Receivers of the Philadelphia & Reading R. R. Co., 184 Pa. 578.   We there said, under conditions to which our words were no more applicable than to those in. this case :  " It is a question of fact, as it seems to us, whether, in view of all the circumstances, the open gate, the repeated signals of the flagman, the absence of a warning by the train of its approach and the impossibility of seeing down the tracks until fairly upon them, the plaintiff omitted any precaution that a prudent man should have taken to secure his safety from danger.   He was responsible for none of the circumstances to which we have referred.   He had the assurance of the defendant company by the open gate and by the positive intimation of the flagman, that there was no train approaching within such a distance as could threaten his safety in crossing the tracks, and there was nothing to counteract this assurance or put him on notice of danger.   He knew that his view of the tracks was obstructed, but one who had superior knowledge of the moving trains allayed his apprehensions by signaling him that it was safe to cross at that time, and that he should pro-

ceed to do so.   In view of all these considerations and his own testimony the question of contributory negligence was surely not a question of law.   It depended upon the plaintiff's credibility, upon the situation of the obstruction to his view down the railroad, upon the opportunity to escape after he saw the train, upon the want of any warning of its approach by the train, and upon the conduct of the flagman."

Moore, who was standing on the step, to the right of the plaintiff, with an arm around him, and obstructing his view, was able to see the approaching train when within a few feet of the wagon, and made a hairbreadth escape from danger by jumping.   That he was able to do so, because he could see the danger when it was almost upon him, is no reason, as a matter of law, why McCarthy, who may not have been able to see it, ought also to have saved himself from it by jumping.

Judgment affirmed.